UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

MIDDLEBURY SECURITIES, LLC,

          Plaintiff,

v.

BACTERIN INTERNATIONAL, INC.,

          Defendant.

Civil Action No.:

**COMPLAINT**

---

Plaintiff Middlebury Securities LLC ("Middsec" or "Plaintiff"), through its undersigned counsel, The Salvo Law Firm, P.C., as and for its complaint against Bacterin International, Inc. ("Bacterin" or "Defendant") alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, unjust enrichment and promissory estoppel.

2. The claims arise out of Bacterin's refusal to pay Middsec in full for its services in securing, negotiating and arranging a $25 million credit facility for Bacterin (the "Credit Facility").

3. Specifically, Bacterin paid Middsec for Bacterin's first "drawn down" of $20 million on the Credit Facility, but did not pay Middsec for a second "draw down" of $4 million.

4. The payment on the second "draw down" should have been 2% of the value of the draw down in cash and 2% of the value of the draw down in warrants – the same percentages as Bacterin paid on the first "draw down."

5. This equates to (i) an $80,000 cash fee (the "Fee") and (ii) $80,000 in warrants in Bacterin (the "Warrants") on the $4 million "draw down."

1

6. Even though Middsec fully performed its obligations, Bacterin refused to pay the agreed upon fee on the second "draw down."

7. Bacterin's actions are in blatant disregard of a written agreement between Middsec and Bacterin in which Bacterin agreed to both pay the Fee and issue the Warrants (the "Fee Agreement") on the first tranche of $20 million and any additional draw downs.

8. In or about October 2011, Bacterin engaged Middsec to assist Bacterin in its efforts to obtain financing.

9. Beginning in or about October 2011 through August 24, 2012, Middsec worked diligently to secure and arrange for the Credit Facility.

10. As a direct result of Middsec's efforts, Middsec introduced Bacterin to several potential investors – including OrbiMed Advisors LLC ("OrbiMed").

11. Middsec worked with Bacterin to arrange, negotiate and finalize a credit facility with Orbimed, which resulted in Bacterin and OrbiMed closing on the Credit Facility on August 24, 2012.

12. Bacterin borrowed an initial $20 million from the Credit Facility and could draw additional funds in the future, on the remaining $5 million.

13. Bacterin benefited tremendously from the Credit Facility.

14. This is reflected in an exhibit to the Securities and Exchange Commission Form 8-K of Bacterin's parent – Bacterin International Holdings, Inc. ("Bacterin Holdings") – that Bacterin Holdings filed with the SEC on August 28, 2012.

15. The Form 8-K that states, among other things, "[t]he [Credit Facility] will enable Bacterin to execute its growth strategy through anticipated profitability."

16. Pursuant to an agreement between the parties, Bacterin was to pay Middsec on the first $15 million of an initial $20 million drawdown on the Credit Facility.

17. This was because Bacterin had paid a fee to Middsec on a $5 million loan that Middsec procured and arranged for Bacterin, and Bacterin would pay such loan from the proceeds of the initial $20 million draw down on the Credit Facility.

18. Under the Fee Agreement, Bacterin explicitly agreed to pay 2% of the value of the initial draw-down and any future draw-down in the form of a cash fee to Middsec and issue 2% of the value of the initial draw-down and any future draw-down in the form of warrants to Middsec.

19. In an August 29, 2012 email chain between John Gandolfo, Bacterin's Chief Financial Officer, and Chris Shaw, a Middsec Investment Banker, (the "August 29th Emails") Messrs. Gandolfo and Shaw confirmed this agreement.

20. Mr. Gandolfo stated in the August 29th Emails that Bacterin had "approved" the payment of a 2% cash fee and issuance of 2% in warrants to Middsec on Bacterin's $15 million of the initial $20 million draw-down on the Credit Facility and for each "addtl [sic] draw down."

21. In conformance with the Fee Agreement, Bacterin paid a cash fee of $300,000 to Middsec and issued $300,000 in warrants to Middsec on September 4, 2012 on $15 million of the initial $20 million Bacterin borrowed from the Credit Facility.

22. As reflected in Bacterin Holding's SEC Form 8-K, filed on March 10, 2014, on or about March 6, 2014, Bacterin made its second draw-down on the Credit Facility.

23. Bacterin borrowed an additional $4 million dollars under the Credit Facility.

24. Bacterin never notified Middsec of the second draw-down.

25. Instead, Middsec learned of the second draw-down from the 8K filing.

26. Middsec then contacted Bacterin and requested payment.

27. Bacterin, however, refused (and continues to refuse) to both pay the Fee to and issue the Warrants to Middsec despite the Fee Agreement.

28. Bacterin has never articulated any real basis for its refusal to do so other than to claim, "payment was not approved since there is no formal banking agreement in place".

29. The August 29th Emails, however, constitute the written Fee Agreement, which contains Bacterin's unequivocal guarantee to both pay the Fee and issue the Warrants.

30. Accordingly, on or about April 4, 2014, Middsec's outside counsel sent a letter to Daniel S. Golberger, Bacterin's current CEO, demanding payment of the Fee and issuance of the Warrants.

31. Bacterin never responded to the letter and continues to refuse to pay the Fee and issue the Warrants.

32. As a result of Bacterin failing to abide by the terms of the Fee Agreement, it must pay: (i) $80,000 to Plaintiff for the Fee and (ii) $80,000 in Warrants to Plaintiff.

## PARTIES

33. Middsec is a Delaware Limited Liability Company and had its offices in Ridgewood, New Jersey for part of the time relevant herein, currently has its offices in Wyckoff, New Jersey and has its principal place of business in Weybridge, Vermont.

34. Bacterin is a Nevada Corporation with its principal place of business in Belgrade, Montana.

## JURISDICTION AND VENUE

35. Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events and omissions giving rise to Middsec's claims occurred in this District.

## FACTS

### A. Bacterin and Middsec's Business Relationship Prior to Bacterin Entering into the Credit Facility

37. Middsec had worked with Bacterin in the past on four transactions prior to securing the Credit Facility.

38. In 2009, Middsec secured a bridge loan for Bacterin, for which Bacterin paid Middsec a fee.

39. Middsec then advised Bacterin on a transaction in which Bacterin was reversed into a public shell entit\y, for which Bacterin paid Middsec a fee.

40. Middsec also performed services on behalf of Bacterin on a debt transaction with Western Technology Investment, for which Bacterin paid Middsec a fee.

41. Later, Middsec secured a revolving credit facility for Bacterin with MidCap Financial.

42. At first, Bacterin refused to pay Middsec for its services in securing that revolving credit facility.

43. Bacterin, however, later paid Middsec a fee for securing the revolving credit facility, and subsequently paid another fee to Middsec on an increase in the revolving credit facility.

### B. Middsec Arranges for, Negotiation on behalf of, and Advises Bacterin on, the Credit Facility

44. At various times during the October 2011through August 2012 time period, Middsec worked with Bacterin from its office in New Jersey, to arrange and finalize the Credit Facility.

45. This included Middsec introducing several potential lender to Bacterin (including Orbimed) to secure the Credit Facility by, <u>inter alia</u>, locating and interviewing potential lenders, assisting with the transmission of information and documents between Bacterin and OrbiMed, advising Bacterin on the terms of the Credit Facility, advising Bacterin in negotiating the Credit Facility and organizing meetings and conference calls between Bacterin and OrbiMed (and participating in such meetings and conference calls).

46. On October 26, 2011, Mr. Gandolfo – Bacterin's CFO who works remotely from New Jersey – accepted Mr. Shaw's email invitation, which Mr. Shaw sent from his office in New Jersey, to a November 1, 2011 meeting with OrbiMed to discuss OrbiMed's interest in providing a Credit Facility.

47. On November 1, 2011, representatives from OrbiMed, Bacterin and Middsec met to discuss OrbiMed and Bacterin entering into the Credit Facility.

48. On November 2, 2011, Matt Wotiz of OrbiMed, sent an email to Mr. Shaw at his office in New Jersey, requesting information and documents as part of OrbiMed's due diligence in determining whether it would enter into the Credit Facility.

49. In an email of the same day, which Mr. Shaw sent from his office in New Jersey, Mr. Shaw transmitted OrbiMed's due diligence request for information and documents to Mr. Gandolfo.

50. On November 17, 2011, Mr. Shaw sent an email from his office in New Jersey to Mr. Gandolfo outlining OrbiMed's proposed framework and terms for entering into the Credit Facility.

51. Mr. Gandolfo responded in an email of that same day, which Mr. Shaw received at his office in New Jersey, that Middsec had done "Nice work" thus far.

6

52. On December 1, 2011, Mr. Shaw sent another email from his office in New Jersey to Mr. Gandolfo with an update to the terms of the Credit Facility.

53. On December 15, 2011, representatives from OrbiMed, Bacterin and Middsec met in New York to further discuss the terms of the Credit Facility.

54. During the week of January 9, 2012, representatives from OrbiMed, Bacterin and Middsec met and OrbiMed presented its term sheet for the Credit Facility (the "Term Sheet").

55. The Bacterin Board of Directors initially voted not to move ahead with the Term Sheet and nothing transpired on the Credit Facility from March through mid-June 2012.

56. Mr. Gandolfo, however, sent an email to Mr. Shaw on June 13, 2012, which Mr. Shaw received at his office in New Jersey, stating that Bacterin had, without first notifying Middsec, re-started conversations with OrbiMed about entering into the Credit Facility.

57. That evening, Mr. Gandolfo emailed a revised Term Sheet to Mr. Shaw at his office in New Jersey.

58. The revised Term Sheet had some minor changes from the original Term Sheet, but was structurally the same.

59. On June 15, 2012, the Bacterin Board of Directors approved the Term Sheet.

### C. Bacterin Enters Into the Credit Facility and Agrees to Pay the Fee and Warrants to Middsec

60. As a result of Middsec's efforts, Bacterin and OrbiMed closed on the Credit Facility on August 24, 2012, and Bacterin borrowed an initial $20 million of the $25 million available to it under the Credit Facility for which Bacterin paid Middsec $300,000 and issued $300,000 in warrants to Middsec.

61. Prior to the closing, Plaintiff and Defendant had discussed Bacterin's payment to Middsec for Middsec procuring the Credit Facility.

62. Originally, Bacterin had agreed to pay Middsec a 3% fee and issue 3% in warrants on any amounts funded under the Credit Facility.

63. Bacterin later agreed to pay a 2% fee and issue 2% in warrants to Middsec.

64. Bacterin confirmed this in the August 29th Emails.

65. In point of fact, the August 29th Emails, sent and received within New Jersey, constitute the written Fee Agreement as evidenced by Messrs. Gandolfo and Shaw's statements therein:

- A. In an email sent at 1:20 pm, Mr. Gandolfo stated, "Guy [Cook, then CEO of Bacterin,] approved the 2% cash fee ($300k)/2% warrants on $15mm as a fee to [Middsec] for the Orbimed transaction. Can you send back a reply email confirming our agreement . . ."

- B. Less than ½ hour later, Mr. Shaw confirmed the arrangement, stating in the email, "That's good to hear and I think fair and reasonable for all. To clarify, if the company were to draw down on the other $5MM[,] the fee would apply as well, correct? If so, consider this email a confirmation of our agreement . . ."

- C. Within one minute, Mr. Gandolfo sent a reply email and stated, "Correct on the addtl [sic] drawdown;" and

- D. In an email sent less than 10 minutes later, Mr. Shaw responded that, "We [Bacterin and Middsec] are in agreement."

66. Bacterin's course of conduct also established that it **agreed to both pay the Fee and issue the Warrants to Middsec.**

67. In fact, Bacterin wired $300,000 (2% of $15 million) to Middsec as the cash fee and issued 2% in warrants to Middsec on or about September 4, 2012.

68. In addition, on four prior transactions that Middsec worked on with Bacterin, Bacterin paid a fee (and such fees were for a greater percentage of the value of those transactions than the 2% fee and 2% in warrants for the Credit Facility).

**D. Bacterin Takes a Second Draw-Down on the Credit Facility, but Refuses to Pay the Agreed Upon Fee and Warrants to Middsec in Breach of the Fee Agreement**

69. On or about March 6, 2014, Bacterin made a second draw-down on the Credit Facility, this time for $4 million.

70. In an apparent attempt to hide the second draw-down from Middsec, Bacterin never notified Middsec of this draw-down.

71. Bacterin's behavior in this regard was consistent with its actions in the prior debt transaction it had entered into with MidCap when it had initially refused to pay a fee to Middsec, but eventually did.

72. Middsec learned of the $4 million draw-down on the Credit Facility from a press release and an 8-k filing, and then sent two invoices for the Fee and Warrants to Bacterin.

73. Despite the written Fee Agreement, however, Bacterin wrongfully refused to both pay the Fee and issue the Warrants to Middsec.

74. In response to the first invoice, Mr. Gandolfo refused to pay the Fee and Warrants – arguing that "payment was not approved since there is no formal banking agreement in place".

75. Bacterin ignored the second invoice.

76. Middsec's outside counsel then sent a letter on April 4, 2014 to Daniel S. Golberger, Bacterin's current CEO, demanding payment of the Fee and issuance of the Warrants pursuant to the express terms of the Fee Agreement.

77. Bacterin never substantively responded to the letter and simply continued to refuse to pay the Fee and issue the Warrants.

78. As a result of Bacterin failing to abide by the terms of the Fee Agreement, it owes at least $80,000 to Plaintiff and must issue $80,000 in warrants to Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

79. Plaintiff repeats and realleges Paragraph 1 through 78 as if fully stated herein.

80. As evidenced by, <u>inter alia</u>, the emails and communications referenced above, the Fee Agreement is a contract between Defendant and Plaintiff.

81. The terms of the Fee Agreement indisputably called for both the payment of the Fee and issuance of the Warrants to Plaintiff in exchanging for Plaintiff securing the Credit Facility.

82. Plaintiff fully performed under the Fee Agreement by securing the Credit Facility.

83. Even though Plaintiff completely performed under the Fee Agreement, Defendant has breached the Fee Agreement by neither paying the Fee nor issuing the Warrants to Plaintiff as agreed upon for the second "draw down."

84. As the direct, natural, and proximate result of the foregoing breach, Plaintiff has been damaged in an amount to be determined at trial, but no less than the $80,000 Fee, plus interest, and $80,000 in Warrants, plus interest, to Plaintiff.

### SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

85. Plaintiff repeats and realleges Paragraph 1 through 84 as if fully stated herein.

86. As evidenced by, <u>inter alia</u>, the emails and communications referenced above, the Fee Agreement is a written contract between Defendant and Plaintiff.

87. The terms of the Fee Agreement indisputably called for the payment of the Fee and Warrants to Plaintiff in exchange for Plaintiff securing the Credit Facility.

88. Plaintiff fully performed under the Fee Agreement by securing the Credit Facility.

89. Even though Plaintiff completely performed under the Fee Agreement, Defendant has breached the Fee Agreement by neither paying the Fee nor issuing the Warrants to Plaintiff on the second "draw down."

90. Defendant arbitrarily, unreasonably, and capriciously failed to pay the Fee and issue the Warrants with the objective of preventing Plaintiff from obtaining the benefits (in the form of the Fee and Warrants) of its complete performance under the Fee Agreement.

91. As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than the $80,000 Fee, plus interest, and $80,000 in Warrants, plus interest, to Plaintiff.

### THIRD CLAIM FOR RELIEF
### (Quantum Meruit)

92. Plaintiff repeats and realleges Paragraph 1 through 91 as if fully stated herein.

93. As set forth in further detail above, Plaintiff performed services for Defendant by securing the Credit Facility for Defendant in good faith.

94. Defendant accepted and benefited from such services.

95. Plaintiff expected compensation for such services in the form of the Fee and the Warrants based on conversations between Bacterin and Middsec, the course of conduct between Bacterin and Middsec on prior transactions and the Fee Agreement.

96. The reasonable value of such services is $80,000 plus $80,000 in Warrants.

97. As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than the $80,000 Fee, plus interest, and $80,000 in Warrants, plus interest, to Plaintiff.

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

98. Plaintiff repeats and realleges Paragraph 1 through 97 as if fully stated herein.

99. As set forth in further detail above, Plaintiff conferred a direct benefit upon Defendant in the form of the valuable Credit Facility.

100. As evidenced through, inter alia, the numerous emails and communications described above, Plaintiff expected the Fee and Warrants as payment in exchange for finding the lender for, and arranging the, Credit Facility.

101. It was only through Plaintiff's efforts that Plaintiff was able to secure the Credit Facility for the direct benefit of Defendant.

102. Defendant's failure to pay the Fee and issue the Warrants has allowed Defendant to retain the Fee and Warrants to which it is not entitled.

103. As a result of such failure to pay the Fee and Warrants, Defendant has been inequitably enriched.

104. Because of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than the $80,000 in Fee, plus interest, and $80,000 in Warrants, plus interest, to Plaintiff.

## FIFTH CLAIM FOR RELIEF
### (Promissory Estoppel)

105. Plaintiff repeats and realleges Paragraph 1 through 104 as if fully stated herein.

106. As evidenced through, inter alia, the numerous emails and communications described above, Defendant made a clear and definite written promise to both pay the Fee and pay the Warrants to Plaintiff in exchange for Plaintiff securing the Credit Facility for Defendant.

107. As evidenced through, inter alia, the numerous emails and communications described above, Defendant expected it would pay the Fee and issue the Warrants to Plaintiff for Plaintiff securing the Credit Facility, and Plaintiff reasonably expected such payment in exchange for Plaintiff securing the Credit Facility.

108. Defendant's failure to pay the Fee and issue the Warrants results in a definite and substantial detriment to Plaintiff in the form of the nonpayment of the Fee and Defendant's failure to issue the Warrants.

109. As a result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than $80,000 Fee, plus interest, and $80,000 in Warrants, plus interest, to Plaintiff.

WHEREFORE, Plaintiff respectfully requests to court to enter judgment for Plaintiff and against Defendant as follows:

A. Awarding Plaintiff (i) $80,000 for the Fee and (ii) $80,000 in Warrants;

B. Awarding punitive damages in favor of Plaintiff and against the Defendant;

C. Awarding attorneys' fees and costs in favor of Plaintiff;

D. Awarding prejudgment interest; and

E. Granting such other and further relief as the Court may deem just and proper.

Dated: June 17, 2014

THE SALVO LAW FIRM, PC

By: /s/ Cindy D. Salvo
CINDY D. SALVO

185 Fairfield Avenue
Suite 3C/3D
West Caldwell, New Jersey 07006
(973) 226-2220
(973) 900-8800 (fax)

Attorneys for Plaintiff,
Middlebury Securities, LLC